IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

ELIZABETH JESSE,

     **Plaintiff,**

**vs.**                              **CIVIL ACTION NO. 1:20-CV-00288**

**ANDREW SAUL,**
**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered April 24, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support of Motion for Judgment on the Pleadings (ECF Nos. 19, 20), as well as Defendant's Brief in Support of Defendant's Decision (ECF No. 22).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's motion for judgment on the pleadings (ECF No. 19), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 22); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

## Procedural History

1

The Plaintiff, Elizabeth Jesse (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on March 24, 2017 alleging disability beginning April 19, 2016 due to back pain, diabetes, and asthma. (Tr. at 10, 164, 195) Her claim was initially denied on July 5, 2017 (Tr. at 92-96) and again upon reconsideration on September 19, 2017 (Tr. at 102-108). Thereafter, Claimant filed a written request for hearing on September 28, 2017 (Tr. at 109-110).

An administrative hearing was held on December 17, 2018 before the Honorable Francine A. Serafin, Administrative Law Judge ("ALJ"). (Tr. at 31-62) On March 21, 2019, the ALJ entered an unfavorable decision. (Tr. at 7-23) On April 16, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 161-163) The ALJ's decision became the final decision of the Commissioner on February 26, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On April 23, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) Defendant (hereinafter referred to as "the Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 13, 14) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and a Memorandum in Support of Motion for Judgment on the Pleadings (ECF Nos. 19, 20), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 22) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 48 years old as of the alleged onset date, defined as a "younger person" by the Regulations, and then changed age categories to a "person closely approaching advanced age" during the underlying proceedings. See 20 C.F.R. § 404.1563(c), (d). (Tr. at 40) Claimant has a

high school education and worked as a customer service representative for Dish Network for about sixteen years. (Tr. at 40-41, 196)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The

Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

## Summary of ALJ's Decision

In this particular case, the ALJ found Claimant met the insured status requirements through December 31, 2021. (Tr. at 12, Finding No. 1) Next, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since April 19, 2016, the alleged onset date. (Tr. at 13, Finding No. 2) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: lumbar spondylosis and asthma. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except

> she can frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, or crawl. She should avoid frequent exposure to extreme cold, heat, wetness, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation; and avoid workplace hazards such as moving machinery and unprotected heights.

(Tr. at 15, Finding No. 5)

At step four, the ALJ found that Claimant is capable to perform her past relevant work as a customer service representative. (Tr. at 18, Finding No. 6) Finally, the ALJ determined Claimant had not been under a disability since April 19, 2016 through the date of the decision. (Id., Finding No. 7)

## Claimant's Challenges to the Commissioner's Decision

Claimant has asserted that the ALJ failed to properly consider the medical evidence related to Claimant's treating physicians, Edgar Weaver, Jr., M.D., and Gregory Howes, D.O., by not recognizing the conflict between that evidence and the other evidence documented by Robert Crow, M.D., and John Feldenzer, M.D, (ECF No. 20 at 16-18) Further, Claimant contends that the ALJ failed to properly evaluate the opinion provided by Dr. Weaver and never explicitly referenced Dr. Howes at all. (Id.) Additionally, Claimant argues that the ALJ's evaluation of the intensity, persistence, and limiting effects of Claimant's symptoms on her functional limitations was deficient in accordance with Social Security Ruling ("SSR") 16-3p. (Id. at 18-20) Because of these errors, Claimant argues the final decision is not supported by substantial evidence and asks the Court to remand this matter to correct these errors. (Id. at 20)

In response, the Commissioner contends that the ALJ not only discussed the relevant evidence of record and appropriately assessed the resulting RFC based upon same, but also is not obligated by law to discuss every piece of evidence in the record. (ECF No. 22 at 10-12) In her discussion of the evidence, the ALJ gave the proper weight to Dr. Weaver's opinion, and explained how it was inconsistent with the other evidence – which included a review of the medical evidence from Drs. Feldenzer, Smith and Crow. (Id. at 13-14) The Commissioner states there is no unresolved conflict between the opinions of Drs. Weaver and Howes and Drs. Feldenzer and Crow; the ALJ appropriately resolved any conflicts in the evidence. (Id. at 15-16) The ALJ also appropriately evaluated Claimant's subjective statements against the evidence of record, and provided examples from the evidence that substantiated her findings, and articulated her reasons for her conclusions in compliance with legal standards. (Id. at 17-18) Finally, the Commissioner argues the final decision is supported by the substantial evidence and asks this Court to affirm. (Id.

at 19)

**The Relevant Evidence of Record**[1]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

The Medical Evidence:

Claimant established care with Todd Smith, D.O., as her primary care provider on January 4, 2016. (Tr. at 365) She indicated a desire to obtain an MRI but her insurance company required a course of physical therapy prior to approving the MRI. (Id.) At that time she complained of low back pain over a period of 3 to 4 months, and less frequent hip pain; she reported that muscle relaxers and pain medication did not help. (Id.) An examination revealed normal strength and tone in all extremities and tenderness to palpation of the lumbosacral spine. (Tr. at 367)

Claimant underwent a course of physical therapy beginning January 14, 2016. (Tr. at 487-493) At that time she presented with complaints of right leg pain and back discomfort with the worst pain being in her lumbar region. (Tr. at 488) She rated her pain as 6 of 10, and 10 of 10 at its worst; she described her pain as aching and shooting, and was aggravated by driving, walking, quick movements and pushing heavy objects. (Id.) She indicated it was alleviated by Advil, use of a heating pad and movement. (Id.) She reported being able to perform her bed mobility with difficulty; personal activities of daily living, but was unable to lift; she also indicated that household activities such as cooking, cleaning and grocery shopping were painful and that her

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings; Claimant has emphasized that while the ALJ also found her asthma to be a severe impairment, her "disability turned upon the severe impairments relating to her lumbar spine, which the ALJ referred to as lumbar spondylolysis" (ECF No. 20 at 2), accordingly, the recitation of the medical evidence concerns this severe impairment.

husband performed those functions. (Id.). On examination mobility was found to be guarded and painful, gait was independent with ambulation, though her gait pattern was "not normal"; she could negotiate stairs with a reciprocal gait with and without rails; her spine range of motion was restricted; palpation tenderness in the L4-5 was noted; lower extremity strength was 5/5 bilaterally; pelvic mobility was within normal limits; bilateral piriformis tightness and hip flex work tightness were noted. (Tr. at 488-489)

A note from February 3, 2016 indicated that none of the goals for therapy had been met and that Claimant's subjective reports indicated the decrease in her ambulation ability from 15 to 20 minutes down to 10 to 15 minutes; she also reported that her average pain on a daily level remained 6 of 10, with the worst being 10 of 10, and the best being 3 of 10 when she was lying down at night. (Tr. at 479) She was also noted to stand in an extremely forward flexed posture. (Id.) The note also indicates that the February 3 session was Claimant's last visit. (Id.)

A lumbar MRI was taken on February 25, 2016 which indicated a mild disc bulge in mild-to-moderate flattening of acquired narrowing of the ventral subarachnoid space with possible relative borderline acquired narrowing of the canal and slight flattening of the adjacent ventral cord but no cord impingement at T11/T12, minimal to mild disc bulges were noted at several levels, and a small posterior central peripheral annular disk tear/fissure were noted at L3/L4, L4/L5 and possibly at L5/S1. (Tr. at 475) There was no evidence of a focal disc protrusion (herniation) in the lumbar spine was seen; the report also indicated relative borderline acquired narrowing of the canal at L4/L5. (Id.)

A return visit to Dr. Smith on March 7, 2016 indicated Claimant was waiting to hear from Wake Forest about an appointment for her back. (Tr. at 355) On examination, Dr. Smith noted

moderate tenderness generalized over the spinal column with pain referring laterally to left lower back and normal strength and tone in all extremities and a normal gait. (Tr. at 356, 357) Dr. Smith's impression was a worsening of her condition with no relief from physical therapy; Dr. Smith started her on Ultram, as she reported having tried Tylenol, Ibuprofen and Naprosyn without relief, and that she was unable to tolerate Neurontin. (Tr. at 355, 357)

On April 5, 2016, Claimant was seen by Dr. Edgar N. Weaver Jr., a neurosurgeon at Carillion Clinic Neurosurgery in Roanoke, Virginia, primarily for back pain. (Tr. at 377) Dr. Weaver noted Claimant had "some vague symptoms, but this is primarily antigravity back pain but also with a compression loading symptomatology as well." (Id.) He noted Claimant described the primary point pain as the midline in the lumbosacral area and that she was "quite tender there in the prone position." (Tr. at 377-378) Dr. Weaver noted from the MRI scan done in February that Claimant has got three level discogenic changes with high intensity zone at all three levels indicating "severe incapacitating discogenic pain." (Tr. at 378) Dr. Weaver further observed, "this is a difficult problem controversial in terms of relief by surgery, but this lady is totally incapacitated and we will make some decision thereafter." (Id.) X-rays on Claimant's lumbar spine performed that day showed moderate degenerative disc disease at L5-S1 and 7.5 mm of positive sagittal balance. (Tr. at 380-381)

In an April 19, 2016 treatment note that contained no examination findings, Dr. Weaver opined that Claimant had severe axial antigravity pain, grade III, almost grade IV, and that Claimant had three potential options: "do nothing, for her to apply for disability. She should be a good candidate for this, but she clearly says that she is dysfunctional with or without the need to work. Another option, is to proceed with an attempted stabilization . . . in my opinion, is probably

the last option." (Tr. at 375) Dr. Weaver also identified an option of a percutaneous dorsal column stimulator to be discussed with Dr. Howes, who would be taking over her case. (Id.) Dr. Weaver opined, "I do not think she can work with the present problem" and that was not primarily a disability issue, but "she has a clear discogenic pathology." (Id.)

Later that month, Claimant underwent a lumbar epidural steroid injection on April 27, 2016 (Tr. at 289, 379). On May 4, 2016, Claimant called Dr. Weaver's office requesting an appointment with Dr. Howes as soon as possible stating that the epidural injection she had the previous Wednesday was not working. (Tr. at 374) A note of a telephone encounter on May 31, 2016 indicated Claimant had called stating she could not be seen until November for a spinal cord stimulator trial but she could not wait that long and wished to proceed with the last option stabilization surgery Dr. Weaver had discussed. (Tr. at 373)

On June 22, 2016, Dr. Weaver's colleague Gregory Howes, D.O., recorded unremarkable examination findings, including no tenderness with palpation of Claimant's lumbar spine or sacroiliac joint, normal lumbar range of motion, normal strength in all extremities, normal muscle bulk and tone, normal gait and station, normal sensation, and normal reflexes (Tr. at 373). Dr. Howes opined that Claimant had mild to moderate degenerative joint disease (Id.). He recommended core strengthening exercises, facet injections, and a referral to pain management (Id.).

On September 30, 2016, Claimant began treatment with Chong Hwan Kim, M.D., of The Center for Pain. (Tr. at 297-301) Claimant advised Dr. Kim that she received no relief from prior injections or physical therapy (Tr. at 297). Dr. Kim noted that Claimant walked with an abnormal gait with no limping (Tr. at 300). He observed tenderness on palpation of Claimant's lumbar facet

joint and abnormal lumbosacral spine flexion and extension, but he recorded negative straight leg raising test results and negative Patrick-Faber test results (Tr. at 299). Dr. Kim diagnosed lumbar spondylosis without myelopathy or radiculopathy and recommended a medial branch block (Tr. at 300). He ordered an MRI, which revealed mild disc bulge at T11/T12, minimal to mild disc bulges at several levels, small posterior central peripheral annular disc tears/fissures at L3/4, L4/L5 and possibly at L5/S1, and no evidence of a focal disc protrusion in the lumbar spine (Tr. 326). In November 2016 and December 2016, Dr. Kim administered corticosteroid injections (Tr. 303, 306). On December 16, 2016, Dr. Kim's colleague, Wilfrido Tolentino, PA-C, observed tenderness with palpation of Claimant's lumbosacral spine, positive Patrick-Faber test results, no lumbosacral muscle spasm, and normal lumbosacral motion (Tr. 310). He opined that Claimant experienced "improved function and pain relief," and her medication provided an improved quality of life without untoward side effects (Tr. at 310). He noted that he would continue conservative treatment (Tr. at 311).

On a January 13, 2017, Dr. Kim noted that Claimant had no relief with medication, and he administered sacroiliac joint injections (Tr. at 312-313). During another examination on January 16, 2017 with Mr. Tolentino, the Patrick-Faber Test was positive and Gaenslen's sign was again observed. (Tr. at 316) There was no muscle spasm noted and the lumbosacral spine motion was normal, however tenderness on palpation of the sacroiliac joint was noted as was pain in the hip. (Tr. at 316-317) It was noted that Claimant had her first SI injection recently and had achieved 70% relief with that injection. (Tr. at 318) An additional injection was done on January 27, 2017, with Claimant later reporting on February 16, 2017 that it provided 25% pain relief lasting for one day. (Tr. at 317, 321) Claimant also reported having constant sharp pain in the

tailbone area that had increased for the last two weeks; she noted that riding in the car made her pain significantly worse in that heat or laying on her sides eased the pain, but the pain was constant. (Tr. at 321) Dr. Kim recorded no musculoskeletal findings but assessed sacroiliitis, low back pain, and spondylosis without myelopathy or radiculopathy, and referred Claimant to Dr. Howes for a surgical consult. (Tr. at 323) Claimant could not return to Dr. Howes due to a change in her Medicaid coverage (Tr. at 51), instead, she saw John Feldenzer, M.D., of Greenbrier Neurosurgery on April 5, 2017. (Tr. at 502-507)

Claimant explained to Dr. Feldenzer that her back pain began in April 2016 after she helped her husband push her motorcycle out of the garage (Tr. at 503). She reported that her legs were "fine," with no radiating pain, numbness, tingling, or weakness (Id.). Dr. Feldenzer observed that she sat comfortably on the examination table and did not appear to be in acute pain (Id.). She exhibited normal upper and lower extremity bulk and tone, full strength, normal reflexes, intact sensation, tenderness to palpation of the lumbosacral junction with no paraspinous spasm or tenderness in the sacroiliac or sciatic notch areas, negative straight leg raising test results, and an unremarkable gait (Tr. at 504). He opined that Claimant had chronic lumbosacral pain syndrome with no radiculopathy or neurological deficit (Id.). He further noted, "[a]ctually she appears quite comfortable sitting on my exam table when she says that she is in significant pain" (Id.). He further opined that Claimant did not have a structural problem in her lumbar spine requiring operative intervention (Id.). He also opined that it was "a bad idea" to treat her with daily chronic narcotic analgesics, and that she was not a candidate for surgery, and that if she wanted to pursue surgery, she should be referred back to Dr. Weaver (Id.). He diagnosed low back pain (Id.).

On May 18, 2017, Claimant presented to the Princeton Community Hospital Emergency Room due to a motor vehicle accident and complaining of mid to low back pain. (Tr. at 465) Examination revealed vertebral tenderness from T-11 to L4, a normal neck, normal extremities, and normal neurological findings. (Tr. at 466) A CT study of her lumbar spine indicated no evidence of acute displaced fracture, compression fracture, spondylolysis or spondylolisthesis in the lumbar spine; mild hypertrophic degenerative bony changes; a mild bulge minimally indenting the thecal sac at L4/L5; and a mild disc bulge minimally centrally accentuated at L5/S1 mildly indenting the thecal sac at L5/S1. (Tr. at 472)

Claimant returned to the emergency room on July 27, 2018 for chest pain; an examination revealed normal extremities, including normal range of motion. (Tr. at 435-436)

On October 12, 2018, Claimant saw Robert Crow, M.D., a neurosurgeon, on referral from Dr. Smith. (Tr. at 419-422) At that time she presented with a chief complaint of low back pain that had persisted for approximately two years; she denied any radiating symptoms and described her pain as throbbing and constant and rated it at 9 of 10. (Tr. at 419) She indicated that walking or sitting for prolonged periods made her symptoms worse, and that rest helped improve the symptoms slightly. (Id.) She was indicated to be taking Cymbalta with some relief of symptoms, and denied any present physical therapy or other treatments. (Id.) She indicated she had had injections previously without relief of symptoms. (Id.) Dr. Crow observed Claimant exhibited a normal gait and station, normal lower extremity range of motion without pain, normal lumbar range of motion with mild pain, mild pain with palpation of the lumbar spine, full strength throughout, intact sensation, negative straight leg raising test results, and normal reflexes (Tr. at 421). Dr. Crow noted that a recent CT scan revealed mild degenerative changes in the

lumbar spine without any significant neural compromise (Id.).  He diagnosed low back pain and noted that Claimant was overweight (Id.). Dr. Crow did not recommend surgery, noting that Claimant denied radicular symptoms and paresthesia, but instead recommended conservative treatment, including physical therapy (Id.). If Claimant's pain did not improve with physical therapy, Dr. Crow recommended that she consult with a pain management specialist for injections, radio frequency ablation, and a possible spinal cord stimulator trial (Id.).

State Agency Medical Consultants' Opinions:

In June 2017, at the initial level of review, Caroline Williams, M.D., reviewed the record and opined that Claimant could lift twenty-five pounds frequently and fifty pounds occasionally; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; perform unlimited balancing; frequently stoop, kneel, crouch, and climb ramps and stairs; occasionally crawl and climb ladders, ropes, and scaffolds; and she must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, pulmonary irritants, and hazards (Tr. at 70-74).

In September 2017, at the reconsideration level, Palle Reddy, M.D., reviewed the updated record and concurred with Dr. Williams' opinion in all aspects (Tr. at 85-88).

Claimant's Statements and Testimony:

In a Function Report completed in conjunction with her application, Claimant reported that she cared for her personal needs, shopped in stores, managed her household finances, read, watched television, socialized with others, and attended church (Tr. at 207-210). She followed spoken and written instructions, handled stress and changes in routine "reasonably well," and got along with others (Tr. at 211-212). She reported that she used a walker and cane around the house,

neither of which was prescribed (Tr. at 212); she indicated that she cannot stand long enough to cook, cannot walk well or bend or stretch due to pain and can no longer sit through an entire movie (Tr. at 208, 209, 210).

At the administrative hearing, Claimant testified she had stopped working because of her back issue. (Tr. at 42) She had begun having trouble approximately a month prior and she had some pain which was not that bad. (Id.) However, after she helped her husband lift a motorcycle at their home, her back problems increased significantly. (Id.) Claimant thought she would return to work, but then resigned in December 2016 when she realized she was not going to be able to return to her work due to her back pain. (Tr. at 42-43)

Claimant testified that she frequently lays down during the course of the day due to her back pain and the only relief she tends to get is from laying on her sides. (Tr. at 44) She also testified that she believed an eight-hour period without having the opportunity to lay down would be extremely painful to her. (Tr. at 49) She testified that sometimes walking around "a little bit" will relieve her pain little, but if she walks too much, she must stop and recover until she can continue. (Tr. at 47)

She testified she has a driver's license but has difficulty driving if the trip was more than 5 or 10 minutes; her husband typically drives. (Tr. at 44-45)

Claimant testified that she does not do much around the house: she will do light cooking but does not prepare full meals; her activities, whatever they may be, are typically performed within a 5 to 10 minute window in which she can function. (Tr. at 45-46) She testified that she has pain daily and that the only time the pain is not present is when she is laying on her side; she described her pain at the time of the hearing as a sharp aching pain in the low center of her back

14

and rated it a 10 out of 10. (Tr. at 46-47) She testified that she frequently finds her pain distracting in that it makes it difficult to think of anything else. (Tr. at 49)

Concerning household chores, Claimant indicated that her husband does most of the chores, such as cooking cleaning and shopping. (Tr. at 45) Her grandchildren, ages 15 and 12, who live in the household, also help. (Id.) She testified that such an arrangement is dramatically different from how the household has typically operated as she did the cleaning and most of the cooking and laundry historically. (Id.)

Claimant testified she was taking prescribed medicines Cymbalta and Celebrex to address her back pain. (Tr. at 47) She indicated the medications did not make the pain go away, but as long as she is laying on her side, they help with the pain. (Id.) With those medications she testified that she can sleep, however if she has to get up in the middle of the night, she has difficulty returning to sleep. (Id.) She also testified she took Percocet previously, but that medication did not help her significantly. (Tr. at 48)

Claimant also discussed her course of past treatment: she indicated that she had tried physical therapy, as recently as a couple of weeks prior to the hearing, but that it had not given her any relief at that time, or previously. (Tr. at 50) She also testified that she had undergone injections, but they had not helped, only the numbing agent used in the area before the injections did provide some brief relief; once the numbness wore off, "it was back to the same old pain." (Id.)

In terms of physical functioning, Claimant testified that constant standing or constant sitting, or even getting up and down, will make it worse. (Tr. at 48) She testified that standing without leaning against anything would produce significant pain and discomfort after 10 to 15 minutes. (Id.) She testified that sitting in chairs, similar to those in the hearing room, would cause

her significant pain or discomfort after 5 to 10 minutes. (Id.)

Vocational Evidence:

The ALJ asked the vocational expert whether jobs existed for an individual of Claimant's age, education, and work background, who could perform light work involving frequently climbing ramps and stairs; occasionally balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds (Tr. at 55). The hypothetical person would have to avoid frequent exposure to extreme cold, heat, wetness, humidity, vibration, fumes, odors, dust, gases, poor ventilation, and workplace hazards such as moving machinery and unprotected heights (Id.). The vocational expert testified that a person with such a background and limitations could perform Claimant's past relevant work as a customer service representative as it was actually and generally performed by Claimant (Tr. at 56).

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

16

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Evaluating Opinion Evidence:

20 C.F.R. § 404.1527 governs the SSA's criteria for evaluating opinion evidence; per § 404.1527(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Under § 404.1527(c)(1), more weight is given to an opinion provided by a physician who examines a claimant than to a non-examining physician. With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2).[2] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed

---

[2] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

As noted *supra*, Claimant takes issue with the ALJ's consideration of the evidence as it relates to Dr. Weaver's (and to a lesser extent, Dr. Howes') treatment of her back problems, arguing that Dr. Weaver's records demonstrate that Claimant's condition was far more severe than the ALJ acknowledged. (ECF No. 20 at 16-18)

As an initial matter, while Claimant asserts that the ALJ does not specifically reference Dr. Howes in the written decision, as noted by the Commissioner (See ECF No. 22 at 12-13): " '[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision[.]' " Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2006) (*per curiam*)); see also Call v. Berryhill, Civil Action No.2:17- CV-02292, 2018 WL 4659342, *4 (S.D.W. Va. Sept. 28, 2018). While the ALJ may not have specifically mentioned Dr. Howes' records, she stated that she considered all the evidence of record. (See Tr. at 11 ("After careful consideration of all the evidence. . ."); Tr. at

18

12 ("After careful consideration of the entire record. . ."; and Tr. at 16 ("After careful consideration of the evidence . . ."). Having so stated, this court should "take her at her word." Reid, 769 F.3d at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); see also Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."); Christina W. v. Saul, No. 4:19-cv-00028-PK, 2019 WL 6344269, *4 (D. Utah Nov. 27, 2019)("Plaintiff further argues that the ALJ erred in not explicitly discussing various pieces of evidence, particularly the fact that she is participating in a structured treatment program. While the ALJ must consider all the evidence, she need not recite each piece of evidence she has considered. The ALJ stated that she carefully considered the entire record and the Court can take her at her word.").

Moreover, despite Claimant's contention otherwise, it is clear that with regard to her back claim, the ALJ not only recognized the conflicts in the record, but also reconciled them in compliance with her obligations under the pertinent legal authority. (Tr. at 14-18) At the third step in the sequential evaluation process, the ALJ explicitly found that Claimant's back problems failed to meet or equal Listing 1.04, which concerns disorders of the spine, noting that the evidence did not demonstrate compromise of a nerve root or the spinal cord. (Tr. at 14) The ALJ referenced imaging from February 2016 that revealed mild disc bulges at several levels, though no evidence of focal disc protrusion in the lumbar spine. (Tr. at 14-15, 326)[3] The ALJ then compared these findings to imagining from May 2017 that revealed no acute displaced fracture, compression

---

[3] The MRI was ordered by Claimant's treating physician, Dr. Smith, who has been treating Claimant for her back and other conditions prior to and after her alleged onset date.

fracture, spondylosis or spondylolisthesis in her lumbar spine, although there was evidence of mild

disc bulges in her lower spine. (Tr. at 15, 472)[4] Additionally, the ALJ noted that the Claimant has

normal gait and posture. (Tr. at 15, 335, 338, 344, 366, 373, 394)[5]

In her discussion of the evidence for the RFC assessment, the ALJ acknowledged

Claimant's testimony and statements made in her application for benefits that she was unable to

work due to severe pain in her back, rendering it difficult to sit, stand, or walk for prolonged

periods and described her pain as aching, burning, stabbing, stinging, and throbbing and that the

only thing that relieved her pain was lying on her side. (Tr. at 15, 211, 214) She noted that Claimant

had alleged that no treatment - physical therapy, injections, and medication - provided any relief

for her pain, except for the temporary numbing she received prior to each injection. (Tr. at 15-16)

The ALJ then noted that despite Claimant's history of lumbar spondylosis, she had no myelopathy

or radiculopathy. (Tr. at 16, 300, 306)[6] The ALJ recognized that while Claimant did exhibit

tenderness on palpation of the lumbar spine (Tr. at 16, 299, 316, 339, 350) as well as abnormal

spine motion and flexion and extension (Tr. at 16, 299), at other times she also demonstrated

normal motion (Tr. at 16, 310, 316, 373), and had negative straight leg raising tests (Tr. at 16, 299,

421).[7] The ALJ considered additional evidence prior to Claimant's alleged onset date, beginning

with the January 2016 evaluation before beginning physical therapy, which documented

[4] Though this MRI was ordered by the emergency room physician, it is noted that Dr. Smith was copied on the results of findings and impressions.

[5] The medical records cited by the ALJ were provided by: Dr. Smith, dated February 28, 2017 and November 29, 2016; Beverly Whitt, CFNP, with Dr. Smith's office, dated September 23, 2016; Dr. Smith, dated January 4, 2016; Dr. Howes, dated June 22, 2016; and Dr. Smith, dated June 28, 2017, respectively.

[6] The ALJ cited records from Dr. Kim, dated September 30, 2016 and December 2, 2016, which documented Claimant's injections treatment for her back pain.

[7] The ALJ cited medical records from Dr. Kim dated September 30, 2016; Mr. Tolentino, PA-C dated January 16, 2017; Dr. Smith dated November 29, 2016; Dr. Smith dated July 6, 2016; Mr. Tolentino dated December 16, 2016; Dr. Weaver dated June 22, 2016; and Dr. Crow dated October 12, 2018.

Claimant's "guarded and painful" mobility, "independent" ambulation, her ability to negotiate steps with or without a handrail as well as range of motion and mobility being within normal limits. (Tr. at 16, 488, 489)[8] In corroboration with Claimant's testimony, the ALJ noted that her symptoms were treated with epidural steroid injections and prescription medication. (Tr. at 16, 290, 303, 379)[9] Additionally, the ALJ noted Dr. Weaver's April 2016 suggestion of stabilization surgery was a "last option", and compared this with Dr. Feldenzer's opinion from 2017 that Claimant's "mild condition did not make her a candidate for surgery or anything other than conservative treatment." (Tr. at 16, 375, 504) The ALJ then discussed more recent records from Dr. Crow in October 2018 which showed that Claimant was able to tandem walk and toe walk without difficulty, and that she exhibited normal, pain-free range of motion in her lower extremities, with no crepitus, and full range in her lumbar spine, with only mild pain on flexion and extension and mild pain to palpation without asymmetry, defect, tenderness, mass, or effusion and demonstrating full strength as well as negative straight leg testing. (Tr. at 16, 421) The ALJ noted that Dr. Crow "encouraged" Claimant to "continue conservative treatment." (Id.)

In addition to Claimant's testimony and statements given in support of her claim and the medical evidence of record, the ALJ also considered the opinion evidence. The ALJ reviewed the opinions provided by the state agency consultants and determined they were entitled to little weight "because the evidence supports the finding that the combination of the claimant's impairments make her incapable of performing at the medium exertional level." (Tr. at 17, 71-72, 86-87) The ALJ next considered the opinion of Dr. Weaver, noting that he opined Claimant "would 'be a good

---

[8] The ALJ again referenced the imaging reports from February 2016 and May 2017 that she reviewed at the third step. (Tr. at 16)

[9] The ALJ cited the treatment records from Roanoke Memorial Hospital dated April 27, 2016 and a treatment note from Dr. Kim dated November 11, 2016 concerning the injections.

candidate for' disability, and wrote that he does not 'think she can work' due to her back problem." (Tr. at 17, 374) The ALJ found this "limiting opinion" is not supported by Dr. Weaver's own examinations, "which revealed no tenderness, normal range of motion, normal gait, and only minimum changes to the spine." (Tr. at 17, 373, 381)[10] The ALJ further compared this opinion with other medical evidence which demonstrated Claimant generally had a normal gait and posture and used no assistive device. (Tr. at 17, 335, 338, 366, 394)[11] The ALJ determined Dr. Weaver's opinion was entitled to little weight.

In sum, it is clear that the ALJ's discussion of the opinion evidence with the other evidence of record shows that the ALJ gave a thorough consideration of Dr. Weaver's opinion and compared his findings with the other evidence of record, which is clearly the intent of the pertinent Regulations, *supra*. To the extent that Dr. Weaver provided an opinion as it related to Claimant's work-related capabilities, it is well known that the Regulations specifically reserve such determinations solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. See 20 C.F.R. § 404.1527(d)(2) and (3). Finally, with respect to the "good reasons" provided by the ALJ for not giving Dr. Weaver's opinion controlling weight, the ALJ has discharged her duty pursuant to Section 404.1527(c)(2) and provided an adequate explanation allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

In sum, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence provided by Dr. Weaver is supported by substantial evidence.

---

[10] It is noted that the ALJ cited Dr. Weaver's "limiting opinion" was from May 4, 2016 and compared this to other treatment records dated June 22, 2016, which concerned observations compiled in a progress note by none other than Dr. Howes, as well as a radiology report concerning an April 4, 2016 x-ray of Claimant's total spine.
[11] The ALJ cited numerous treatment notes recorded by Dr. Smith, which were dated February 28, 2017, November 29, 2016, January 4, 2016, and June 28, 2017.

Evaluation of Symptoms in Disability Claims:

Claimant also asserts that the ALJ's analysis of her subjective complaints is unsupported by substantial evidence because it did not comply with the factors enumerated under SSR 16-3p, and specifically does not mention Claimant's activities of daily living, but only relies upon the objective medical evidence to discredit Claimant's allegations of disability. (ECF No. 20 at 18-20)

SSR 16-3p[12] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or

---

[12] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 404.1529(c)(3).

While Claimant has also argued that the ALJ failed to mention Claimant's daily activities despite her allegations that they were significantly restricted (ECF No. 20 at 19), the ALJ did mention what daily activities Claimant admitted she remained capable of, including reading and watching television, and albeit less frequently, attending church "when she can." (Tr. at 14, 210,

211)[13] Again, it must be emphasized that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." See Manigo v. Colvin, 2015 WL 74954, at *5 (D. S.C. Jan. 6, 2015) (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). Indeed, "there is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." Id.

Of significance here is that Claimant asserts that the "practical effect of the ALJ's analysis" is that she essentially did "little more than" gleaning what objective evidence there was from the record to support an unfavorable disability finding. (ECF No. 20 at 20) Recently, the Fourth Circuit held that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). Indeed, as observed by Claimant, the Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and

---

[13] The ALJ referenced the statements Claimant made in her Function Report.

demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting Claimant's complaints.

To the extent Claimant has argued that the ALJ "gives no significant consideration to [her] complaints or testimony concerning the location, duration, frequency and intensity of her pain, or their precipitating or aggravating factors" (ECF No. 20 at 19), this argument lacks merit. As noted supra, the ALJ considered Claimant's application for disability insurance benefits and her hearing testimony, noting that she alleged she was unable to work due to severe pain in her back and that her pain worsened with sitting and standing, rendering her unable to perform many postural movements and that physical therapy, injections, and medications were unsuccessful in staving off her pain, save for lying on her side. (Tr. at 15, 211, 214) Further, after properly performing the two-step process, the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, and found that they "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 16)

The ALJ then reviewed the medical records, discussed supra, first recognizing that "claimant's allegations regarding the severity of her back impairment are not fully supported by the evidence of record." (Tr. at 17) In Hines v. Barnhart, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely
> because they are not substantiated by objective evidence of the pain itself or its

> severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1995)). The ALJ observed that while Claimant stated that "nothing helps her pain, she reported experiencing some significant improvement with the joint injections she received in 2017." (Tr. at 17, 318, 321) The ALJ further observed that although Claimant did not find conservative treatment enough to help with her pain, "it was noted by doctors that the claimant was not a candidate for surgery and should be taken off narcotic analgesics . . . [t]he doctors noted that conservative treatment was a good plan for the claimant." (Tr. at 17, 504, 421)[14] Further, though Claimant "reported that she requires a cane or assistive device for walking" (Tr. at 17, 212), the ALJ noted that "the record reveals that she generally had normal gait and posture, and no assistive device was noted." (Tr. at 17, 335, 338, 344, 366, 373, 394) Moreover, the ALJ recognized that Claimant's examinations were generally non-remarkable, exhibiting normal functioning and that imaging revealed only mild abnormalities. (Tr. at 17, 326, 472)

Following her review of the medical and other evidence of record, the ALJ determined "[t]he foregoing supports the finding that the claimant can perform light work, with additional postural and environmental limitations, as to not worsen her pain symptoms." (Tr. at 17) It is also important to recognize, too, that the ALJ, with the assistance of a vocational expert, determined

---

[14] This is also distinguishable from Arakas, wherein the ALJ discredited the claimant's subjective complaints based partly on her "conservative course of treatment" and the fact that she no longer took narcotic painkillers, but only antidepressants and nonsteroidal anti-inflammatory pain relievers. However, the Court noted that the claimant's doctors' treatment decisions were wholly consistent with how her severe impairment, fibromyalgia, is generally treated. A claimant cannot be faulted "for failing to pursue non-conservative treatment options where none exist." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d at 102 (quoting Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010)).

that despite Claimant's impairments, including her subjective complaints, she remained capable of performing her past relevant work as a customer service representative, a sedentary job. (Tr. at 18) The ALJ determined that Claimant's past relevant work did not require her to perform tasks precluded by her RFC. (Id.)

Given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig, 76 F.3d at 589. The ALJ provided an adequate review that included not only Claimant's testimony, but also the objective medical evidence of record and other evidence of record.[15] In short, the ALJ provided a fairly thorough and adequate review of Claimant's subjective complaints, reconciled them with the medical and other evidence of record, and ultimately determined that her symptoms did not limit her to the extent alleged.[16] Indeed, as noted by the Commissioner (ECF No. 22 at 18), while the ALJ did not specifically find that Claimant's conservative treatment of her back issues was a major success, the law does not require one to be pain-free of experience no discomfort in order to be found not disabled. Hays v. Sullivan, 907 F.2d 1453, 1458 (4th Cir. 1996). In this case, it is clear that the ALJ did not select only those portions from the objective medical evidence that failed to support Claimant's allegations of

---

[15] As noted in footnote 13, *supra*, the ALJ considered Claimant's statements from her Function Report.
[16] Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." (quoting Craig, 76 F.3d at 589)).

disabling impairments, the ALJ also considered the objective medical evidence that did support her claims, as well as her testimony and other evidence, both supporting and non-supporting.[17]

The undersigned **FINDS** that the ALJ's subjective symptoms analysis complied with the pertinent Regulations and controlling case law and is based upon substantial evidence. The undersigned further **FINDS** the ALJ's discussion of the objective and other evidence of record in her evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the evidence of record complied with the applicable law and is supported by substantial evidence.

Finally, the undersigned further **FINDS** that the final decision denying Claimant's application for benefits is supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's motion for judgment on the pleadings (ECF No. 19), **GRANT** the Commissioner's request to affirm the decision below (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

---

[17] For instance, though not specifically raised as an issue on appeal, it bears mentioning that the ALJ considered Claimant's asthma, which she found to be a severe impairment (Tr. at 13), and noted that in addition to being a "chronic smoker" and encouraged to quit tobacco, that Claimant presented to the emergency room in July 2018 for chest pains and shortness of breath, but records showed she was not in distress and her lungs were clear. (Tr. at 17, 276, 422, 435-436) The ALJ further noted that records showed Claimant's asthma was not as severe as alleged because she generally did not experience chronic cough, difficulty breathing, shortness of breath, or wheezing, plus she continued to smoke daily. (Tr. at 17, 335, 338, 344, 353, 393, 404) Nevertheless, the ALJ took all this evidence into consideration when she included certain environmental limitations in the RFC assessment (Tr. at 15); this is another instance of the ALJ considering both supporting and non-supporting evidence from the overall record in her analysis of Claimant's statements about the intensity, persistence, and limiting effects of her symptoms and finding them inconsistent.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 18, 2021.



Omar J. Aboulhosn
United States Magistrate Judge